**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
EASTERN DIVISION

| | | |
|---|---|---|
| **AEREAUNA HOULE,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: _____ |
| | ) | |
| v. | ) | **CIVIL COMPLAINT** |
| | ) | |
| **UNIVERSITY OF NORTH DAKOTA**, | ) | **DEMAND FOR JURY TRIAL** |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

Plaintiff, Aereauna Houle ("Ms. Houle"), by and through her counsel at the L.L. DUNN LAW FIRM, PLLC, and ROBINS KAPLAN, LLP, hereby files this Complaint against Defendant, University of North Dakota ("UND"), for claims arising out of ongoing sexual harassment, stalking, and abuse by a former tenured social work professor, Andrew Quinn.[1]

## INTRODUCTION

1.     During the fall of 2017, while the #MeToo movement swept the nation to hold sexual perpetrators and their enablers accountable, Defendant UND assigned an unsuspecting undergraduate student, Ms. Houle, to a new academic advisor, Andrew Quinn, *a known harasser*.

2.     In April 2018, prior to Quinn's sexual harassment and abuse of Ms. Houle, UND Social Work Chair Carenlee Barkdull predicted that "something terrible" would happen one day due to Defendant UND's "inaction" regarding Quinn's repeated harassment of female students.

3.     Starting in November 2018, after Ms. Houle sought a letter of recommendation from Quinn as part of her application to UND's Graduate School of Social Work, Quinn exploited

---

[1] *See* Joshua Peguero, *Complaint: Ex-University Professor Manipulated and Coerced Students*, KFYR (Feb. 10, 2020), *https://www.kfyrtv.com/content/news/Complaint-ex-UND-professor-manipulated-and-coerced-student-567747551.html.*

his position of authority over Ms. Houle to harass, stalk, and abuse her. Ms. Houle promptly reported this *quid pro quo* sexual harassment to Defendant UND in early December 2018, but it did nothing in response. On December 30, 2018, under the guise of discussing academic research, Quinn attacked and orally raped Ms. Houle to escalate his sexual harassment into abuse.

4.      When Defendant UND finally intervened in mid-January 2019, its interventions were wholly ineffective. Quinn repeatedly violated the issued no-contact directive and no-trespass order to stalk, harass, and abuse Ms. Houle. Quinn stalked Ms. Houle while she attended classes and repeatedly drove by her campus residence, which is where she lived with her domestic partner and their young children. *While still a tenured professor, Quinn further terrorized Ms. Houle by posting Craigslist ads that solicited other men to have sexual encounters with her.* While all this occurred, Defendant UND allowed Quinn to complete the semester on a *paid* administrative leave.

5.      In the spring of 2019, due to the hostile and dangerous environment on Defendant UND's campus, Ms. Houle's family fled town for their safety. In April 2019, Defendant UND required Ms. Houle to either withdraw completely or take an incomplete that semester due to the impact of Quinn's harassment on her ability to complete her social work internship. About a month after this, Defendant UND offered Quinn a sweetheart deal of resigning voluntarily. Upon information and belief, Defendant UND thus allowed Quinn to leave campus without incurring financial losses associated with termination or ever facing criminal charges for his stalking and harassment.

6.      In the aftermath, Quinn continued to stalk and harass Ms. Houle until November 2019. Defendant UND failed to ensure that Ms. Houle could return safely to complete her social work internship. Absent its efforts to ensure her equal access to education, Ms. Houle has been

unable to complete her undergraduate degree or subsequently seek a graduate degree in social work, which has severely delayed her career and limited her earning potential.

7.     Upon information and belief, Defendant UND fostered a culture of silence around the sexual harassment and abuse of its students.  Upon information and belief, this culture stemmed from Defendant UND's policy, practice, and/or custom of responding with deliberate indifference to reports of sexual misconduct.  Upon information and belief, Defendant UND furthered its policy, practice, and/or custom of deliberate indifference by failing to adequately train faculty, staff, and students about Title IX.  As a result, upon information and belief, Defendant UND routinely failed to offer victimized students protections against ongoing harassment and retaliation. Defendant UND also failed to provide victimized students with remedies that could ensure their equal access to educational opportunities and benefits on campus, as guaranteed by Title IX.

## JURISDICTION & VENUE

8.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiff's claims assert federal questions regarding her rights under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681, *et seq*. ("Title IX").

9.     This Court has personal jurisdiction over Defendant UND under FED. R. CIV. P. 4(k)(1), because Defendant UND is located and/or regularly conducts business in this District and the conduct giving rise to the claims in this case occurred in this District.

10.    Venue in this District is proper under 28 U.S.C. §§ 1391(a)(2) and 1391(b)(2) because the events and/or omissions giving rise to Plaintiff's claims emanated from activities within this jurisdiction and Defendant UND conducts substantial business in this jurisdiction.

## PARTIES

11.    Plaintiff, Ms. Houle, is a resident of and domiciled in the State of North Dakota.

12.     Defendant, UND, is the state university of North Dakota, and it is located in Grand Forks, North Dakota.  N.D.C.C. § 15–11–01.

## FACTUAL ALLEGATIONS

13.     Upon information and belief, Andrew Quinn had a significant history of mental illness and related residential treatment.

14.     On August 15, 2005, Defendant UND hired Quinn as an assistant professor in the Department of Social Work.

15.     Less than a month into his employment, UND's Social Work Department Chair recommended Quinn for full faculty membership to UND's Graduate School of Social Work.  This membership allowed Quinn to serve on thesis committees and as an advisor for students seeking independent studies.

16.     On October 25, 2005, Defendant UND granted Quinn an associate faculty membership to its Graduate School of Social Work.  Upon information and belief, Defendant UND put Quinn on this fast-track to graduate school faculty membership due to the limited amount of tenured faculty members employed within UND's Social Work Department at that time.

17.     By the spring of 2006, Quinn had served as an advisor to 20 undergraduate students and worked with three graduate students on their thesis projects.  In the fall of 2007, Defendant UND granted Quinn a full faculty membership to its Graduate School of Social Work.

### *Defendant UND Pushes for Quinn's Tenure & Promotes Him to Full Professor*

18.     Quinn received excellent marks during his tenure track with UND until the spring of 2010, when he received lower ratings that threatened his ability to earn tenure status.  When Quinn challenged these ratings, Dean Dan Rice advocated for him with Provost Paul LeBel on March 12, 2010.  Specifically, Dean Rice requested that Defendant UND allow Quinn to remain

in good standing due to the few tenured faculty members within UND's Social Work Department. Provost LeBel granted this appeal and recommended Quinn for tenure during the fall of 2010.

19.     On November 8, 2010, Dean Rice again wrote to Provost LeBel and asked for Defendant UND to make an exception so that Quinn's tenure approval process could be expedited. Upon information and belief, Provost LeBel granted this requested and sought tenure for Quinn in February 2011.  On February 15, 2011, UND's President, Robert Kelly, recommended Quinn's tenure to the Chancellor of the State Board of Higher Education.

20.     On August 16, 2011 Quinn's tenured faculty status started at UND.

21.     Upon information and belief, sometime during the spring of 2011, UND's Social Work Department Chair, Thomasine Heitkamp, learned that Quinn had displayed a sexually explicit image to students during a class.  According to UND Dean Denise Korniewicz, this image depicted "pending intercourse with an engorged penis."  Chair Heitkamp demanded that Quinn remove this pornographic image, and an ongoing dispute arose between Quinn and Chair Heitkamp as a result.

22.     On September 22, 2011, Dean Korniewicz resolved this dispute without undertaking any disciplinary action or other meaningful efforts to prevent Quinn's future sexual harassment of students.  Instead, Dean Korniewicz allowed Quinn's agreement not to display the image again to be sufficient to resolve the dispute.  Dean Korniewicz then discouraged Quinn from signing a memorandum written about the incident (presumably authored by Chair Heitkamp) by stating that Quinn would not suffer any penalty by refusing to do so.

23.     Thereafter, upon information and belief, Chair Heitkamp continued to have serious concerns with Quinn's performance as a tenured faculty member.

24.     Eventually, Defendant UND hired a new Social Work Department Chair, Carenlee Barkdull, who recommended Quinn for a teaching award during the 2013-2014 academic year.

### *Quinn Sexually Harasses a UND Student*

25.     On March 31, 2016, Defendant UND promoted Quinn to full professor.

26.     Sometime during the 2015-2016 academic year, Quinn engaged in a sexual relationship with a female student who he had taught while at UND.

27.     On April 5, 2016, the female student disclosed the sexual relationship with Quinn to UND faculty member Dr. Yee Han Chun.  Rather than immediately filing a report about this inappropriate sexual relationship with the North Dakota Board of Social Work Examiners ("NDBSWE"), Dr. Chun first obtained Quinn's defense on April 6, 2016 to include in his subsequent report made on April 15, 2016.

28.     Prior to this NDBSWE report, on April 12, 2016, the female student also disclosed the sexual relationship with Quinn to another UND faculty member, Professor Angie Muhs.  On April 23, 2016, Prof. Muhs reported the incident to NDBSWE as sexual harassment.  Specifically, Prof. Muhs recounted in her report that the female student had claimed that Quinn refused to end the sexual relationship under threats of self-harm and had wanted to find the student a "different lover."  Prof. Muhs also reported to the NDBSWE that Defendant UND had encouraged the female student to leave campus due to what had occurred with Quinn.

29.     Within UND, the Provost's Office and Dean of Students' Office, along with Chair Barkdull, BSSW Director Melanie Sage, and Professor Barb Kramer, all had notice of Quinn's inappropriate sexual relationship with this female student.  However, upon information and belief, Defendant UND and its officials did not initiate or conduct a thorough Title IX investigation into the sexual harassment complaint.

30.     Instead, some UND officials defended Quinn before the NDBSWE.  In May 2016, using UND letterhead, both Dean Gayle Roux and UND faculty member Dr. Dheeshana Jayasundara wrote letters of support for Quinn.

31.     On August 31, 2016, Defendant UND issued a reprimand to Quinn for what it described as his "self-disclosed consensual relationship."  This framing ignored the fact that the female student had disclosed sexual harassment when Quinn refused to let her end the relationship. By intentionally ignoring these inconvenient facts, upon information and belief, Defendant UND blindly accepted Quinn's defenses to issue minimal sanctions and thus keep him on as one of few tenured faculty members in its Social Work Department.

32.     On September 19, 2016, Chair Barkdull developed a Performance Improvement Plan that required Quinn to declutter his office and abide by all campus policies moving forward (presumably, something he was already required to do by virtue of his employment).  This plan also required Chair Barkdull to approve when Quinn could "resume undergraduate student advisement."

33.     While the exact date is unknown, Defendant UND approved Quinn to resume advising undergraduate students.

*Ongoing Misconduct Concerns Involving Quinn*

34.     On January 25, 2017, instead of conducting the standard tenure review procedure, Defendant UND substituted its promotional evaluation process for Quinn's standard tenure review. By making yet another exception for him, Defendant UND avoided any review that would have addressed Quinn's sexually inappropriate relationship with a female student.

35.     During the 2017–2018 academic year, Quinn engaged in additional misconduct that warranted a notice from Defendant UND of its intent to dismiss him from employment.  However,

it appears that this dismissal did not occur.  Instead, Quinn remained employed at UND and able to advise undergraduate students one-on-one, including Ms. Houle.

36.     On April 23, 2018, Chair Barkdull memorialized her phone call to Dean Roux, reporting Quinn's "appalling" behavior with yet another female student.  When Dean Roux engaged in victim-blaming, Chair Barkdull had expressed concern that the "continued university inaction" in response to Quinn's harassment of female students "might mean something terrible might someday happen."

37.     On May 1, 2018, Chair Barkdull memorialized that a female student had reported Quinn for aggressively harassing her at a social work field placement site and that this student feared that Quinn would retaliate against her.

### Quinn Targets Ms. Houle for Quid Pro Quo Sexual Harassment

38.     During the fall of 2017, Defendant UND unilaterally transferred Ms. Houle's academic advising from Lani Moen to Andrew Quinn.  Ms. Houle did not have any contact with Quinn until the spring of 2018 when she first took a course with him.  Thereafter, Ms. Houle had minimal contact with Quinn, who often was awkward around her, unable to make eye contact with her, and short with his academic advising time.

39.     During the fall of 2018, Ms. Houle decided to apply to UND's Graduate School of Social Work.  Upon information and belief, UND required Ms. Houle to obtain three letters of recommendation, including one from her academic advisor, Andrew Quinn.  Ms. Houle also asked Prof. Muhs and BSSW Director Barbara Kitko for letters of recommendation.

40.     On November 16, 2018, Ms. Houle met with Quinn about the requested letter of recommendation.  During this meeting, Quinn claimed that his recommendation was necessary, not only for Ms. Houle to attend graduate school but also for her, ultimately, to receive her social

work license.  Quinn also said his endorsement would go far in the social work field. He then proposed working with Ms. Houle on a research project so that she could co-author an academic paper with him and thus improve her application for graduate school.  Quinn also engaged Ms. Houle in an unwelcome sexual conversation about his prior sexual history with a female student.

41.     After this meeting, Quinn asked to meet with Ms. Houle again about the letter of recommendation on November 22, 2018.  When she arrived at his office, Quinn directed Ms. Houle to close the door behind her when she entered.  Due to the clutter in his office, Ms. Houle had to sit immediately next to Quinn.  Under the ruse that this information was necessary for his letter of recommendation, Quinn started to ask Ms. Houle details about her personal life and history.  He also shared information about his personal life.  Upon information and belief, Quinn used these grooming tactics to endear himself to Ms. Houle and thus gain her sympathies and trust.

42.     When Ms. Houle got up to leave the meeting, Quinn stroked and squeezed her buttocks without her consent.  When she turned to confront him, Quinn claimed that this contact had been accidental.  Unsure about how to respond given her desire to maintain his favor, Ms. Houle left his office without further addressing this unwanted sexual contact.

43.     Thereafter, Quinn repeatedly emailed and messaged Ms. Houle on an almost daily basis.  Quinn bombarded her with information and questions about research interests, graduate school, her personal life, and information about his personal life.  He claimed that this level of intense communication was necessary to form the close "working" relationship required to support her graduate school ambitions.

44.     On December 5, 2018, when Ms. Houle followed up with Director Kitko about the letter of recommendation, Ms. Houle also disclosed Quinn's harassment.  Ms. Houle described Quinn's "swift and intense" attentions to be "overwhelming" her.  In response, rather than report

the harassment to appropriate officials at UND, Director Kitko said she would discuss it with Quinn.  In response, Ms. Houle expressed fear that Quinn would retaliate against her.

45.    In the interim, despite Ms. Houle's best efforts to establish professional boundaries with Quinn, he routinely engaged her in personal conversations regardless of her efforts to redirect him and focus on academics.  In response to her efforts, Quinn would insist that Ms. Houle needed to open up more to him about her vulnerabilities and past life experiences as part of his "mentorship" (more accurately described as *emotional manipulation and grooming*).

46.    On December 8, 2018, Director Kitko sent an email to Ms. Houle that she had sought "supervision" about the "information shared" and wanted to meet again.  When the two met on December 10, 2018, Director Kitko reported to Ms. Houle that she had passed the harassment report along to Chair Barkdull.  Despite this actual notice to Defendant UND, no official ever reached out to follow up or otherwise provide Ms. Houle with information about her rights or options to file a complaint and receive interim measures under Title IX.

47.    Based upon advice purportedly received from Chair Barkdull, Director Kitko went on to *discourage* Ms. Houle from reporting the sexual harassment to Defendant UND by claiming it would not take any action in response. This discouragement demonstrated Defendant UND's culture of silence arising out of its policy, practice, and/or custom of deliberate indifference towards sexual misconduct directed at students.  Instead, Director Kitko encouraged Ms. Houle to report the matter only to the NDBSWE.

48.    By this point in time, Quinn's daily communications with Ms. Houle had become intimidating.  Quinn was pushy and self-confident, while Ms. Houle felt unsure about herself and her prospects for graduate school.  Quinn exploited her insecurities by criticizing her academic

writing and claiming that he would have to help Ms. Houle before she would be worthy of acceptance into UND's Graduate School of Social Work.

49.     During the winter break of the 2018–2019 academic year, Quinn offered Ms. Houle a graduate research assistant position with him should she be accepted into UND's Graduate School of Social Work.  He then shared information about potential research projects via a Dropbox folder named "AH + AQ."

50.     On December 20, 2018, Quinn invited Ms. Houle to attend and network at a winter holiday party for Mountainbrooke Recovery Center.[2]  Quinn openly flirted and touched Ms. Houle without her consent while there, which caused her to withdraw and feel unsure about what to do.

51.     The next day, Ms. Houle resolved to confront Quinn about his unwanted sexual attention.  She demanded to meet in his campus office.  Once there, Ms. Houle asked Quinn to stop regularly communicating with her because it had caused her domestic partner to become uncomfortable.  Ms. Houle also cited concerns with Quinn's intense interest in her as a student and openly wondered how others, like her peers, would perceive his attentions.  Ms. Houle thus implied that his unwanted attention would harm her professional reputation and standing in the social work community.

52.     In response, Quinn dismissed Ms. Houle's concerns.  He assured Ms. Houle that their "special relationship" would support her future academic work and career because he was the only tenured professor in the department.  Quinn then warned Ms. Houle that she might not succeed in graduate school without his help by again demeaning her academic writing.  Quinn also pointed

---

[2] *See* "Mountainbrooke has one Goal: Recovery," Grand Forks Herald (Mar. 16, 2018) (describing Quinn's relationship with this organization), https://www.grandforksherald.com/news/2070828-mountainbrooke-has-one-goal-recovery.

out that he helped review applications to UND's Graduate School of Social Work, thus *directly insinuating his ability to retaliate against her for rejecting his advances*.

### *Quinn Sexually Abuses and Stalks Ms. Houle*

53.     On December 30, 2018, Quinn requested that Ms. Houle come over to his home to review grant-related research materials and discuss co-authorship on an academic paper as a way to improve her chances of admission into UND's Graduate School of Social Work.  Ms. Houle assumed that Quinn's family would be present and informed her domestic partner that she would be going over for this academic purpose.

54.     After arriving at Quinn's residence early in the afternoon, Ms. Houle reviewed grant materials with Quinn.  Suddenly, Quinn – who is six-foot tall and weighs approximately 200 pounds – physically forced himself on top of Ms. Houle – who is barely over five-foot tall and weighs around 130 pounds.  During the sexual assault that followed, Ms. Houle could smell alcohol and marijuana on Quinn.

55.     Ms. Houle physically and verbally resisted Quinn while he commanded her to "relax" and said, "you didn't even know what you want."  Quinn then dry-humped her body, unzipped his pants, exposed his erect penis, and then forced his penis into Ms. Houle's mouth. Due to her physical and emotional distress, Ms. Houle gagged and shook to prevent Quinn from completing this forcible oral rape.

56.     Upon ceasing his sexual assault, Quinn warned Ms. Houle against "overthinking" things.  When she went to leave, Quinn warned that they had signed the same social work ethics agreement, thus implying his ability to retaliate against her career should she report him.

57.     Later that same day, Quinn sent Ms. Houle a sexually explicit message.  When Ms. Houle's domestic partner read the message, it caused significant issues within their intimate

relationship.  Ms. Houle's domestic partner thus confronted Quinn and demanded that Quinn leave his partner alone to avoid repercussions.  In response, Quinn taunted her partner by stating that he would not leave Ms. Houle alone.

58.     Quinn then persistently messaged Ms. Houle, demanding that she stay in contact with him.  Ms. Houle felt pressured by her domestic partner not to respond, but she was also terrified that Quinn would retaliate against her academic standing and long-term career prospects.

### *Ongoing Notice to UND about Quinn's Sexual Harassment*

59.     On January 11, 2019, when Ms. Houle met with Prof. Muhs about her social work field placement, she expressed concern that Quinn had wanted to meet weekly about her site placement.  Prof. Muhs confirmed that this was an unusual request for an academic advisor.

60.     To prevent Quinn from gaining further access to her while a student, Ms. Houle disclosed the ongoing *quid pro quo* sexual harassment to Prof. Muhs in an effort to gain assistance. Over time, Ms. Houle eventually disclosed that Quinn had sexually abused her.  Upon information and belief, despite being a responsible employee under Title IX, Prof. Muhs failed to report Quinn's ongoing sexual harassment and abuse of Ms. Houle to appropriate officials at UND.

61.     Immediately following this meeting with Prof. Muhs, Ms. Houle ran into Quinn in a campus hallway.  While she froze, Quinn demanded that they get away from "prying eyes" to discuss the situation.  Quinn then took Ms. Houle to his vehicle parked on campus and asked her to get in.  Concerned about what might happen if she refused, Ms. Houle did so while also alerting her partner on a cell phone app that tracked her location.

62.     When Quinn took Ms. Houle back to his home – where the sexual assault had occurred – he parked in his driveway.  Ms. Houle's partner arrived right around the same time to

rescue her.  Infuriated by this intervention, Quinn continued to harass and stalk Ms. Houle and her domestic partner.

63.     As part of his retaliation, Quinn filed a false report with Defendant UND's campus police about Ms. Houle and her domestic partner.  In doing so, he unintentionally incriminated himself by disclosing that he had a "close" relationship with Ms. Houle in violation of UND's Performance Improvement Plan that required him to maintain professional boundaries with students.

### *Defendant UND's Intervention was Wholly Ineffective to Stop Quinn's Abuse of Ms. Houle*

64.     Days later, on January 17, 2019, Defendant UND placed Quinn on a paid administrative leave.  Defendant UND also issued no-contact and no-trespass order against Quinn to prevent his ongoing access to campus and prohibit his ongoing communications with campus community members, including Ms. Houle.

65.     In direct violation of the no-trespass order, Quinn continued to stalk and harass Ms. Houle through phone-based communications as well as in-person stalking, which occurred on campus while Ms. Houle attended classes and at her campus residence.

66.     On January 24, 2019, Director Kitko and Prof. Muhs detailed Quinn's abuses towards Ms. Houle in a complaint to the NDBSWE.  This report alleged that Quinn had engaged in *quid pro quo* sexual harassment that included attempts to get Ms. Houle alone with him by seeking unnecessary field placement meetings, requesting that she enroll in his evening classes, and asking her to serve as his graduate research assistant, all in exchange for his professional endorsement.  It also disclosed Quinn's physical stalking of Ms. Houle as well as the harm Quinn inflicted upon her domestic partnership due to his ongoing harassment of Ms. Houle and her

domestic partner.  The report also noted Ms. Houle's fear that Quinn would retaliate against her if she took formal action against him.

67.     On January 25, 2019, UND's Title IX Coordinator, Donna Smith, reached out to Ms. Houle.  Instead of informing Ms. Houle about her right to file a complaint against Quinn under 34 C.F.R. § 106.8 ,or have an attorney or advocate assist her during the campus process pursuant to N.D.C.C. § 15–10–56(1), the email erroneously limited Ms. Houle's involvement to that of a witness.  Defendant UND also failed to explicitly offer Ms. Houle any interim measures or accommodations to ensure her safety and ongoing equal access to education.  Instead, Coordinator Smith insisted that Ms. Houle meet in person on campus – the very place where Quinn regularly stalked and harassed her – before she could learn more about her Title IX rights and options.

68.     On February 1, 2019, in violation of the no-contact order, Quinn's lawyer contacted Ms. Houle while she worked at her social work field placement site.  His attorney demanded that Ms. Houle send a letter that he had written on her behalf to UND's Title IX Office.  Due to her ongoing fear of retaliation by Quinn, she complied.  Ms. Houle clarified with Defendant UND, however, that she had not drafted the letter, and that it had come from Quinn's lawyer who had contacted her to demand that she send it.

69.     In February 2019, Quinn repeatedly sought to contact Ms. Houle from various "spoof" phone numbers as part of his obsessive efforts to manipulate and control her during the campus disciplinary process.  As part of his efforts, Quinn threatened to commit self-harm to alarm Ms. Houle and keep her engaging with him.

### Defendant UND's Deliberate Indifference to the Hostile Educational Environment

70.     On March 30, 2019, at Ms. Houle's on-campus residence, campus police arrested Quinn for trespass and possession of drug paraphernalia.  Quinn's ongoing efforts to contact Ms.

Houle and come to her family's on-campus housing had further harmed her domestic partnership and her children.  To date, Ms. Houle is unaware of any criminal charges sought by Defendant UND's campus police against Quinn for this stalking, harassment, and trespass.

71.     Shortly thereafter, Prof. Muhs requested that Ms. Houle meet with her, Director Kitko, and Social Work Director of Field Education Bruce Reeves for a "gatekeeping" meeting. During this meeting on April 5, 2019, which was also attended by Chair Barkdull, Defendant UND decided to prematurely terminate Ms. Houle's internship placement.  Rather than offer Ms. Houle interim measures or accommodations, Defendant UND stated that Ms. Houle could either "withdraw from UND or request an incomplete status."  Regarding the latter option, Defendant UND would not guarantee her a new field internship placement.

72.     When Ms. Houle elected to take an incomplete, Defendant UND required her to meet monthly to review ethical requirements and attend counseling before she could resume the internship again.  Despite Ms. Houle doing so, Defendant UND callously denied her ongoing campus-based counseling services that she had paid for as part of her tuition.

73.     Sometime around April 2019, *Quinn posted Craigslist ads online seeking others to have sexual encounters with Ms. Houle*, which utterly terrified Ms. Houle.

74.     On May 15, 2019, rather than finding Quinn responsible for violations of its Title IX policies for his severe and pervasive harassment, stalking, and abuse of Ms. Houle, Defendant UND allowed him to voluntarily resign.  Upon information and belief, though this sweetheart deal, Defendant UND allowed Quinn to avoid termination and related financial penalties.

75.     By June 2019, Ms. Houle moved off-campus and out of town to reunite with her domestic partner and their children.  Despite repeated moves by Ms. Houle and her domestic partner over the summer and fall of 2019, Quinn continued to stalk and harass them.  Quinn's last

attempt to contact Ms. Houle occurred in November 2019, when he contacted her father in an effort to obtain her new contact information without success.

76.     In August 2019, Quinn admitted to the Grand Forks Police Department that he had posted the Craigslist ads.  However, Ms. Houle is unaware of any criminal charges arising out of this admission.

77.     Around this same time, Defendant UND informed Ms. Houle that she had been added to the field study program for the spring 2020 semester.  Despite this information, Defendant UND never followed up to provide a field placement to Ms. Houle so that she could resume and complete her undergraduate studies.

78.     In February 2020, Quinn sought reinstatement of his social worker license from the NDSWBE.  This prompted Ms. Houle to reach out to the NDSWBE and offer to participate in its process to ensure that this would not occur.  Ms. Houle also agreed to participate as a witness in the NDSWBE process against former UND Professor Jackie Hoffarth, who also had sexually harassed a student within the Social Work Department.

79.     On February 10, 2020, Quinn obtained another sweetheart deal, this time from the NDSWBE, which allowed him to sign a settlement agreement that revoked his license.

80.     To date, Defendant UND has not ensured that Ms. Houle could return to campus and complete her undergraduate degree. Thus, her social work career has been delayed, resulting in lost wages and earning potential.

## COUNT I

**Deliberate Indifference in Violation of the Education Amendments of 1972,
20 U.S.C. §§ 1681, et seq., against Defendant UND**

81.     Plaintiff incorporates by reference the allegations of facts contained in the previous paragraphs as if fully set forth herein.

82.     Upon information and belief, Defendant UND is an educational institution in receipt of federal funding subject to Title IX.

83.     Upon information and belief, responsible employees Director Kitko and Prof. Muhs received actual notice of Quinn's ongoing *quid pro quo* sexual harassment of Ms. Houle.

84.     Director Kitko represented to Ms. Houle that her sexual harassment report against Quinn had been passed to Chair Barkdull, an appropriate official under Title IX, who was capable of addressing the harassment and taking corrective action on behalf of Defendant UND.

85.     Despite receiving actual notice of teacher-on-student sexual harassment, Defendant UND responded with deliberate indifference by failing to take any remedial action in December 2018.  Instead, Defendant UND left Ms. Houle vulnerable to Quinn's ongoing harassment, which escalated into a forcible oral rape on December 30, 2018.

86.     In addition to leaving Quinn to sexually harass and abuse Ms. Houle, Defendant UND further demonstrated its deliberate indifference to this teacher-on-student sexual harassment when it failed to offer Ms. Houle any interim measures to ensure her equal access to education.

87.     As a direct and natural consequence of Defendant UND's deliberate indifference, Ms. Houle has suffered and continues to suffer substantial harm and injuries to this day, including, without limitations, denied educational access, emotional distress, psychological trauma, and mortification for which she is entitled just compensation.

## COUNT II

**Hostile Environment in Violation of Title IX of the Education Amendments of 1972,
20 U.S.C. §§ 1681, et seq., against Defendant UND**

88.     Plaintiff incorporates by reference the allegations of facts contained in the previous paragraphs as if fully set forth herein.

89.     As a female student seeking equal access to educational programs and activities at UND, Ms. Houle was a member of a protected class covered by Title IX.

90.     While an employee of Defendant UND and serving as Ms. Houle's academic advisor, Quinn subjected her to special attention as a female student and unwelcome *quid pro quo* sexual harassment motivated by sexual desire. Quinn's unrelenting harassment campaign, which included stalking and sexual abuse, created an abusive and hostile educational environment on UND's campus that impeded and effectively denied Ms. Houle's equal access to education.

91.     Quinn's ongoing sexual harassment, abuse, and stalking were so severe, pervasive, and objectively offensive that Ms. Houle declined to complete her application to UND's Graduate School of Social Work in an effort to avoid further interactions with Quinn. Defendant UND then unilaterally and prematurely terminated Ms. Houle's field placement internship, which impeded her ability to graduate on time and receive her BSSW.

92.     Defendant UND is liable for the abusive and hostile educational environment on its campus because it had actual knowledge of Quinn's propensity to sexually harass female students when assigning him to serve as an advisor for Ms. Houle.

93.     Defendant UND is also liable for its failure to promptly respond to notice that Quinn had targeted Ms. Houle for *quid pro quo* sexual harassment as part of his ongoing pattern of misconduct toward female students,

94.     Defendant UND is also liable for its failure to remedy the hostile educational environment by offering Ms. Houle interim measures and accommodations that could ensure her ongoing, equal access to education free from such a sexually hostile environment.

95.     As a direct and natural consequence of the sexually hostile and abusive educational environment at UND, Ms. Houle has suffered and continues to suffer substantial harm and injuries

to this day, including, without limitations, denied educational access, emotional distress, psychological trauma, and mortification, for which she is entitled just compensation.

## COUNT III

**Heightened Risk in Violation of Title IX of the Education Amendments of 1972, 20  U.S.C. §§ 1681, et seq., against Defendant UND**

96.     Plaintiff incorporates by reference the allegations of facts contained in the previous paragraphs as if fully set forth herein.

97.     Upon information and belief, despite commonplace sexual misconduct occurring amongst its faculty members, Defendant UND failed to adequately train employees on how to prevent harassment and properly respond to reports of the same under Title IX.

98.     Pursuant to Defendant UND's official policy, practice, and/or custom of deliberate indifference, Defendant UND cultivated a culture of silence by failing to take sexual harassment complaints, conduct adequate investigations and grievance procedures under Title IX, or ensure equal access to education or grievance procedures for victimized students.  For example, in 2016, despite a female student reporting that Quinn had refused to let her end a sexual relationship under threats of self-harm, as reported by Prof. Muhs to the NDBSWE; however, Defendant UND did not address this harassment and instead discouraged the victim from remaining within its Social Work Department.

99.     At least two UND employees have acknowledged Defendant UND's official policy, practice, and/or custom of deliberate indifference towards sexual misconduct.  Specifically, in April 2018, Chair Barkdull memorialized that Defendant UND's "inaction" regarding Quinn's serial harassment of female students would lead to "something terrible" happening someday. Then, in December 2018, Director Kitko informed Ms. Houle that Defendant UND would not take any action upon her sexual harassment report against Quinn.

100.     As a direct and natural consequence of the heightened risk of harassment created by Defendant UND, Ms. Houle has suffered and continues to suffer substantial harm and injuries to this day, including, without limitations, denied educational access, emotional distress, psychological trauma, and mortification, for which she is entitled just compensation.

## COUNT IV

**Erroneous Outcome in Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681, et seq., against Defendant UND**

101.     Plaintiff incorporates by reference the allegations of facts contained in the previous paragraphs as if fully set forth herein.

102.     Counter to her federal right to an equitable grievance process under Title IX, 34 C.F.R. § 106.8, Defendant UND discriminated against Ms. Houle on the basis of sex by denying her the ability to participate in the Title IX grievance process as a complainant while allowing Quinn to participate as a respondent.

103.     Counter to her state right to receive information in writing about her ability to retain an attorney or advocate during the campus process against Quinn, N.D.C.C. § 15–10–56(1), Defendant UND discriminated against Ms. Houle on the basis of sex by failing to inform her.  In contrast, upon information and belief, Defendant UND provided Quinn with information about his right to retain an attorney to assist him during the campus process.

104.     After intentionally disenfranchising Ms. Houle from the campus process, upon information and belief, Defendant UND failed to conduct a prompt, equitable, thorough, reliable, and impartial grievance process, as required under Title IX.  Instead, Defendant UND entered into a sweetheart deal that allowed Quinn to voluntarily resign and thus avoid the consequences of his serial harassment, stalking, and abuse against her.

105.     As a direct and natural consequence of Defendant UND's discriminatory process, Ms. Houle has suffered and continues to suffer substantial harm and injuries to this day, including, without limitation, denied educational access, emotional distress, psychological trauma, and mortification, for which she is entitled just compensation.

## REQUEST FOR RELIEF

106.     WHEREFORE, Plaintiff Aereauna Houle prays for judgment against Defendant UND seeking:

   a.  Compensatory damages in an amount that exceeds $75,000.00, to be proven at trial for:

   i.   past, present, and future psychological pain, suffering, and impairment;

   ii.  medical bills, counseling, and other costs and expenses for past, present, and future medical and psychological care;

   iii. loss of educational access and opportunity; and

   iv.  past, present, and future economic losses, including lost wages;

   b.  Reasonable attorneys' fees, costs, and expenses; and

   c.  All other and further relief that justice may require.

## JURY DEMAND

107.     In accordance with FED. R. CIV. P. 38, Plaintiff Aereauna Houle hereby demands a jury trial on all issues so triable.

Dated: March 4, 2021.                          Respectfully Submitted,

                                               _____
                                               Laura L. Dunn, Esq. (admitted 02/22/2021)
                                               **L.L. Dunn Law Firm, PLLC**
                                               1717 K Street NW, Suite 900
                                               Washington, DC  20006

202-302-4679 (Telephone)
*LDunn@LLDunnLawFirm.com*

*/s/ Timothy Q. Purdon*
Timothy Q. Purdon (N.D. Bar No. 05392)
**Robins Kaplan LLP**
1207 W. Divide Ave., Suite 200
Bismarck, ND  58501
612-349-8767 (Telephone)
*TPurdon@RobinsKaplan.com*